# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DANIEL E. CARPENTER and<br>GRIST MILL CAPITAL, LLC, | : | |
| | : | |
| Plaintiffs, | | Docket No. 3:14CV741 (SRU) |
| | : | |
| VS. | | |
| | : | |
| LYNN ALLEN, CHERI GARCIA,<br>TIMOTHY CORSI, JOHN DOES 1-100,<br>and JANE DOES 1-100, | : | |
| | : | |
| Defendants. | | February 15, 2022 |

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' LYNN ALLEN, CHERYL GARCIA AND TIMOTHY CORSI'S MOTION FOR SUMMARY JUDGMENT</u>

The Defendants, Special Agent Lynn Allen (hereinafter "Special Agent Allen") of the United States Department of Labor (hereinafter "DOL") Office of Inspector General (hereinafter "DOL-OIG"), DOL-OIG Assistant Special Agent in Charge Cheryl Garcia[1] (hereinafter "ASAC Garcia") and DOL Investigator Timothy Corsi (hereinafter "Investigator Corsi") submit the following memorandum of law in support of their motion for summary judgment.

## <u>*ORAL ARGUMENT NOT REQUESTED*</u>

---

[1] ASAC Garcia held several positions at DOL-OIG during her tenure, and while this case has been pending. At the time of the execution of the search warrant on May 26, 2011, ASAC Garcia held the position referenced herein, that is, Assistant Special Agent in Charge.

# BACKGROUND

On May 22, 2014[2], Daniel E. Carpenter ("Carpenter") and Grist Mill Capital, LLC

("GMC") filed a complaint alleging violations of their Fourth Amendment rights, and

Carpenter's Fifth and Sixth Amendment rights, by Special Agent Allen, ASAC Garcia and

Investigator Corsi, and one hundred unknown federal law enforcement agents[3], in connection

with a May 26, 2011 search conducted jointly by the United States Department of Labor's Office

of Inspector General ("DOL-OIG") and the Employee Benefits Security Administration

("EBSA"), at offices located at 100 Grist Mill Road in Simsbury, Connecticut (hereinafter "the

Simsbury site"). *See* Complaint, ECF No. 1. Plaintiffs also sought the return of all material

seized in the 2011 search[4]. *Id.*

Plaintiffs seek money damages related to the search warrant executed by DOL personnel

on May 26, 2011. Complaint, ECF No. 1 at ¶ 10. On July 14, 2021, the Plaintiffs' complaint

was dismissed in large part— leaving the remaining claims "relating to the manner of the

---

[2] This case was stayed during the pendency of Carpenter's underlying criminal prosecution, from October 9, 2015 through November 23, 2020. ECF Nos. 28, 53.

[3] There was a total of only fourteen (14) federal law enforcement agents who participated in the execution of the search warrant at the Simsbury site on May 26, 2011. Operational Plan, Exhibit 1 at 12-13. *Compare* to the IRS-CI Search Team that executed a search warrant at the Simsbury site a year earlier, in April 2010, *Carpenter v. IRS,* Docket No. 3:13-cv-563 (SRU), ECF No. 150 at 30-31 ("I cannot hold that it was unreasonable . . . to plan for a need for 39 officers to search a large site and large quantity of documents—particularly where the amount of time it actually took the officers to complete their search suggests that such a large number of officers was indeed necessary.") The May 26, 2011 DOL Search Team, comprised of just 14 agents and investigators, concluded their search at 1:30 a.m. on May 27, 2011, having encountered similar logistical requirements as those encountered by the IRS-CI agents in 2010. Garcia Declaration (hereinafter cited by paragraph number only) ¶ 8, 17 and Exhibits 6, 7A, 7B to Garcia Decl., Corsi ¶ 6, Deposition of Gerald Giaimo (hereinafter cited by page number only) at 9, lines 10-12.

[4] On July 14, 2021, the Plaintiffs' motion for return of property was taken under advisement by this Court. Ruling, ECF No.79. On November 18, 2021, the Government provided Notice to this Court that Carpenter recently filed a petition pursuant to 28 U.S.C. § 2255, seeking to set aside his underlying criminal conviction and sentence. *See* ECF No. 92. The § 2255 matter is styled *Carpenter v. United States*, Docket No. 3:21CR1485 (RNC), which remains pending. The Government reported in its Notice that to the extent this Court considers entering an order for the destruction of the seized documents, the pending § 2255 matter renders destruction of evidence premature, for the reasons set forth in the Government's Notice.

search—that is, the claims regarding the destruction of property, Carpenter's detention during the search, and whether the search exceeded the scope of the warrant . . ." Ruling, ECF No. 79.

Concerning these three remaining claims, Carpenter and GMC allege that during the 2011 search, the premises were "ransacked" and that Defendants caused "substantial damage to the premises." Complaint at ¶ 14. Carpenter further alleges that during the search he was interrogated without a lawyer present, that he "was placed into custody and questioned despite having invoked his right to remain silent and to have counsel present," and that he was denied his request to review the search warrant. *Id.* at ¶ 26, 27. Carpenter's remaining claim relating to the scope[5] of the warrant alleges that seized items included "income tax filings, banking, insurance policies and other personal information", as well as "attorney-client privileged communications", and that Defendant Corsi seized "confidential information regarding [his] life insurance policies, personal tax returns . . . and homeowners [sic] insurance policy." *Id.* at ¶ 16, 19, 24.

The Defendants now seek summary judgment with respect to these three remaining claims because the undisputed material facts establish that there was no substantial damage caused as a result of the search, Carpenter was neither detained nor interrogated, nor denied his right to counsel during the search, and the items seized did not exceed the scope of the warrant.

## LEGAL STANDARD

*Summary Judgment Standard*

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986) (plaintiff

---

[5] Carpenter also claims that the search was unreasonable as to duration, however that argument was rejected at oral argument before this Court, held on July 14, 2021, largely for the same reasons discussed in this Court's Ruling on Motions to Dismiss and for Summary Judgment in *Carpenter, et al. v. Commissioner of IRS, et al.,* Docket No. 3:13CV563 (SRU), ECF No. 150 at 30, note 44. *See* Complaint, ECF No. 1 at ¶ 15.

must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the nonmoving party"). When a motion for summary judgment is properly supported by documentary and testimonial evidence, however, the nonmoving party may not rest upon the mere allegations or denials of the pleadings but must present sufficient probative evidence to establish a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992). If the nonmoving party submits evidence that is "merely colorable," or is not "significantly probative," summary judgment may be granted. *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48. To present a "genuine" issue of material fact, there must be contradictory evidence "such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate. *Celotex*, 477 U.S. at 322. In such a situation, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323; *accord Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's burden satisfied if he can point to an absence of evidence to support an essential element of nonmoving party's claim). In short, if there is no genuine issue of material fact, summary judgment may enter. *Celotex*, 477 U.S. at 323.

<u>Qualified Immunity</u>

"[T]he defense [of qualified immunity] is meant to give government officials a right, not merely to avoid 'standing trial,' but also to avoid the burdens of 'such pretrial matters as discovery.'" *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996); *see Pearson v. Callahan*, 555 U.S. 223, 231 (2009) ("[Q]ualified immunity is an immunity from suit rather than a mere defense to liability[.]"). "[Q]ualified immunity ... shields Government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Whether a constitutional right is clearly established is a question of law that depends on "whether the decisional law of the Supreme Court and the applicable circuit court support the

existence of the right in question." *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 799 (2014). The Supreme Court has admonished courts not to "define clearly established law at a high level of generality ... since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Id*. (internal citation omitted). "Otherwise, plaintiffs would be able to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (citation, internal quotation marks, and ellipses omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). A defendant's subjective intent is not considered when determining whether his conduct violated a clearly established constitutional right. *Id*. at 736.

As the Second Circuit has explained,

> When a defendant official seeks summary judgment on the ground that he is entitled to qualified immunity, the motion should be granted if either the evidence, viewed in the light most favorable to the plaintiff, is insufficient to establish the violation of a statutory or constitutional right, or if that right was not clearly established at the time of the alleged violation.

*Soto v. Gaudett*, 862 F.3d 148, 156 (2d Cir. 2017) (citing *Rogoz v. City of Hartford*, 796 F.3d 236, 247 (2d Cir. 2015) and *Tracy v. Freshwater*, 623 F.3d 90, 95-96 (2d Cir. 2010)).

The Supreme Court has issued a number of opinions vacating denials of summary judgment in qualified immunity cases, "both because qualified immunity is important to society

as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *White*, 137 S. Ct. at 551 (quoting *City and Cnty. of San Francisco v. Sheehan*, 575 U.S. 600 (2015) and *Pearson*, 555 U.S. at 231 (internal quotation marks and ellipses omitted)).

The Supreme Court has articulated a three-part test for considering a claim of qualified immunity. First, the court must determine whether a constitutional violation could exist on the facts as presented to the court. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, if the facts support a claimed violation of a constitutional right, the court must determine if the right alleged is "clearly established."[6] *Id.* "To determine whether a right is clearly established, [courts] look to (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). If the first two criteria are met, the district court must determine if, based on the facts known to the officer at the time of events, "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

In analyzing whether an officer acted reasonably, the Court must consider the "totality of the circumstances—the whole picture," *Palacios v. Burge*, 589 F.3d 556, 563 (2d Cir. 2009) (internal quotation marks omitted) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)), but that consideration must be limited to "the facts known to the officers," *id.; cf. United States*

---

[6] The Supreme Court has held that "lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first," but has urged courts to "think carefully" before deciding novel questions of constitutional law in the qualified immunity context. *al-Kidd*, 563 U.S. at 735; *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

*v. Chirino*, 483 F.3d 141, 148 (2d Cir. 2007), or at least those facts the officers reasonably should have known.

*Personal Involvement Required*

A plaintiff generally may sue a particular defendant only for his own acts, not the actions of others.[7]  Moreover, the Supreme Court in *Iqbal* confirmed that, even without a heightened pleading standard, damages claims against government officials alleged to arise from constitutional violations cannot be founded upon conclusory, vague, or general allegations. *Iqbal*, 566 U.S. at 678.[8]

Thus, to establish personal involvement in an alleged Fourth Amendment violation, at least one of the following five categories of personal involvement must be shown: 1) direct participation in an alleged constitutional violation; (2) failure to remedy a violation after being informed of it; (3) creation or continuance of a policy or custom under which unconstitutional practices occurred; (4) gross negligence in supervising subordinates who committed the wrongful acts; or (5) deliberate indifference to Plaitniffs' rights by failing to act on information

---

[7] *See Evancho v. Fisher*, 423 F.3d 347, 353 (3d Cir. 2005) (requiring "personal involve-ment"); *Redondo-Borges v. U.S. Dep't of Hous. & Urban Dev*., 421 F.3d 1, 6 & n.2 (1st Cir. 2005); *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004); *Steele v. Fed. Bureau of Prisons*, 355 F.3d 1204, 1214 (10th Cir. 2003) (requiring "direct, personal participation"), abrogated on other grounds by *Jones v. Brock*, 549 U.S. 199 (2007); *Alejo v. Heller*, 328 F.3d 930, 936 (7th Cir. 2003); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (holding that *Bivens* liability "is personal, based upon each defendant's own constitutional violations"); *Johnson v. Newburgh Enlarged Sch. Dist*., 239 F.3d 246, 254 (2d Cir. 2001) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages.") (internal quotation marks omitted); *Cronn v. Buffington*, 150 F.3d 538, 544 (5th Cir. 1998); *Simkins v. D.C. Gov't*, 108 F.3d 366, 369 (D.C. Cir. 1997) ("The complaint must at least allege that the defendant federal official was personally involved in the illegal conduct."); *Pelligrino v. United States*, 73 F.3d 934, 936 (9th Cir. 1996) (requiring "[d]irect personal responsibility"); *Tallman v. Reagan*, 846 F.2d 494, 495 (8th Cir. 1988) ("Only federal officials who actually participate in alleged violations are subject to a *Bivens*-type suit."); *cf. Gonzalez v. Reno*, 325 F.3d 1228, 1234-35 (11th Cir. 2003) (applying heightened pleading standard and dismissing conclusory allegations against supervisory officials as insufficient).

[8] *See, e.g., Evancho*, 423 F.3d at 353; *Bediako v. Stein Mart, Inc*., 354 F.3d 835, 839 (8th Cir. 2004); *Dalrymple*, 334 F.3d 991, 996 (11th Cir. 2003); *Lanier v. Bryant*, 332 F.3d 999, 1007 (6th Cir. 2003); *Trulock*, 275 F.3d at 405 & n.9; S. *Christian Leadership Conference v. Sup. Ct. of La.*, 252 F.3d 781, 786 (5th Cir. 2001); *Cushing v. City of Chicago*, 3 F.3d 1156, 1167 (7th Cir. 1993); *Butler v. Castro*, 896 F.2d 698, 700 (2d Cir. 1990).

indicating that unconstitutional acts were occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Importantly, many circuits treat the question of personal participation as an aspect of the first step of the *Saucier* qualified immunity inquiry.[9] This approach stands to reason. The first step of the qualified immunity analysis focuses on whether "the facts alleged show the officer's conduct violated a constitutional right." *Saucier*, 533 U.S. at 201. If a plaintiff does not allege that a defendant directed any conduct at him, he cannot have alleged that the defendant violated his constitutional rights, let alone any clearly established constitutional rights.

*Theory of Respondeat Superior Not Applicable*

Part and parcel of the requirement to plead personal involvement is the rule that a plaintiff may not maintain a viable claim against a supervisory official simply by alleging that subordinate officers acted improperly. Supervisors cannot be held liable in constitutional tort suits under the doctrine of *respondeat superior*. *See Iqbal*, 566 U.S. at 676 ("respondent correctly concedes that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior"); *Dalrymple*, 334 F.3d at 995; *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002) ("A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort."); *Trulock*, 275 F.3d at 402; *Tlamka*, 244 F.3d at 635; *Ruiz Rivera v. Riley*, 209 F.3d 24, 28 (1st Cir. 2000); *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999); *Bibeau v. Pac. Northwest Research*

---

[9] *McQueen v. Beecher Cmty. Schls.*, 433 F.3d 460, 470 & n.9 (6th Cir. 2006); *Roberts v. City of Shreveport*, 397 F.3d 287, 291-92 (5th Cir. 2005); *Wong v. United States*, 373 F.3d 952, 966-67 (9th Cir. 2004); *Summers*, 368 F.3d at 888; *Gonzalez*, 325 F.3d at 1234-35; *Trulock*, 275 F.3d at 402; *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001). *But cf. Elliot v. Thomas*, 937 F.2d 338, 342 (7th Cir. 1991).

*Found.*, 188 F.3d 1105, 1114 (9th Cir. 1999); *Cronn*, 150 F.3d at 544; *Simkins,* 108 F.3d at 369;

*Del Raine v. Williford*, 32 F.3d 1024, 1047 (7th Cir. 1994).

## STATEMENT OF MATERIAL FACTS

*Special Agent Allen Had No Personal Involvement in the Search and Was Not a Supervisor*

Special Agent Allen has served as a Special Agent at DOL-OIG since 2003.  (*Local Rule 56(a)(1) Statement of Lynn Allen,* hereinafter cited by paragraph number only), Allen ¶ 1. Special Agent Allen was the co-case agent assigned to the Charter Oak Trust criminal investigation.  Allen ¶ 4.  Special Agent Allen was not present at the Simsbury site on May 26, 2011 and did not participate in the physical search of that location.  Allen ¶ 8, Carpenter Response to Admissions 1, 2.  Additionally, while Special Agent Allen was the co-case agent assigned to the Charter Oak Trust investigation, she did not supervise ASAC Garcia.  Allen ¶ 9.

*Investigator Corsi Was Not Part of the Entry Team and Searched Only a Small Area of the Simsbury Site*

Investigator Corsi waited outside the Simsbury site while the Entry Team first entered the Simsbury site and conducted an initial security sweep.  (*Local Rule 56(a)(1) Statement of Timothy Corsi,* hereinafter cited by paragraph number only), Corsi ¶ 5, Operational Plan, Exhibit 1 at 13.  Photographs of the condition of the Simsbury site prior to the search reflect the condition of the site at the time Investigator Corsi entered the building.  (*Local Rule 56(a)(1) Statement of Cheryl Garcia,* hereinafter cited by paragraph number only), Garcia ¶ 7.  Thus, Investigator Corsi had no personal involvement in the initial entry of the Simsbury site, nor in the security sweep.  Once Investigator Corsi did enter the building, he reported to his assigned search area, which was one small area of the building, in and around Carpenter's office.  Corsi ¶ 7.  Investigator Corsi had no personal involvement in the search of any other area of the Simsbury site, nor was he present in the conference room where Carpenter remained. Corsi ¶ 8.

ASAC Garcia began her career with DOL-OIG in 1995 as a Special Agent, and was steadily promoted throughout her career.  At the time of search in May 2011 Garcia held the position of an ASAC with DOL-OIG from 1995.  Ultimately, Garcia retired from DOL-OIG in August 2019[10].  ASAC Garcia had extensive training and experience prior to the search of the Simsbury site.  Garcia was responsible for supervising all phases of the execution of the search warrant at the Simsbury site on May 26, 2011, was the Site Supervisor of the search at the Simsbury site and was also part of the initial Entry Team.   Garcia ¶¶ 1, 2, 4, 6.

The May 26, 2011 search did not cause any damage to the Simsbury site, as alleged by Carpenter.  A comparison of the photographs of the interior of the Simsbury site on the day of the search, taken upon entry of the premises by the Search Team, and then taken again upon completion of the search, demonstrates that the condition of the premises was not substantially changed, nor is there any evidence of substantial damage attributable to the execution of the search warrant.  Exhibits 7A, 7B to Garcia Declaration.  Neither ASAC Garcia, Investigator Corsi, nor Carpenter's attorney, Gerald Giaimo ("Giaimo"), observed any damage to the premises that were alleged to have occurred during the course of the search of the Simsbury site.  Garcia ¶ 17, Corsi ¶ 16, Deposition of Gerald Giaimo, (hereinafter cited by page number only) at 9, lines 8 -10.  Furthermore, GMC's Damages Analysis (ECF No. 94) claims no damages to the premises.  Carpenter did not individually file a separate damages analysis and therefore also does not claim any damages to the Simsbury site.[11]

---

[10] At the time Garcia retired in 2019, she held the position of Assistant Inspector General for Investigations.

[11] The Plaintiffs failed to provide an initial discovery disclosure to the Defendants once the case was commenced in 2014, which should have included a computation of damages.  Fed.R.Civ.P. 26(a)(1)(A)(iii).  On August 6, 2021, the Plaintiffs were ordered by Judge Vatti to submit a damages analysis by October 11, 2021.  ECF No. 85.  On September 24, 2021, Defendants propounded a discovery request upon the Plaintiffs also requesting a damage analysis, due October 24, 2021. Plaintiffs again failed to provide their damages analysis to either Judge Vatti or the

Carpenter was neither detained nor interrogated during the May 26, 2011 search. Carpenter's attorney (Giaimo) was present with Carpenter during most of the time Carpenter was present at the search, and both Carpenter and Giaimo were able to make telephone calls and leave the premises, which they did.

Carpenter was not present at the Simsbury site when the Entry Team first entered the premises on May 26, 2011. Garcia ¶ 7. Carpenter was permitted entry to the Simsbury site at his request, after the security sweep was completed at 10:24 a.m., and photographs were taken of the interior office that was the subject of the search. Garcia ¶ 7, 8. Carpenter was observed reviewing a portion of the search warrant while waiting for his counsel (Giaimo) to arrive at the Simsbury site. Garcia ¶ 10, Exhibit 3 to Garcia Declaration. Giaimo then joined Carpenter by approximately 11:07 a.m. Garcia ¶ 14, Exhibit 5 to Garcia Declaration. Both Carpenter and Giaimo were directed to the same conference room, located near the front of the building. ASAC Garcia and another Special Agent (Special Agent Woolard), remained in the conference room with Carpenter and Giaimo at all times, until Carpenter and Giaimo left together. Garcia ¶ 8, Exhibit 3 to Garcia Declaration, Exhibit 3 to Allen Declaration, Giaimo at 7, lines 8-9, and 9-10, lines 24-9.

ASAC Garcia did not detain Carpenter or place him in custody, nor did she observe anyone else arrest Carpenter or place him in custody during the search. Garcia ¶ 9. Giaimo had

---

Defendants, prompting the Court to reschedule the settlement conference. A damages analysis was finally submitted to Judge Vatti and the Defendants on October 28, 2021. That analysis did not claim any damages to the property at the Simsbury site. More recently, this Court issued a Scheduling Order in the context of its Status Conference Memorandum, ECF No. 93, requiring Plaintiffs to file a damages analysis by January 15, 2022. GMC, only, complied with the scheduling order by filing the same damage analysis and exhibits it submitted to Judge Vatti and the Defendants on October 28, 2021, with the exception of adding an erroneous notation that "the Defendants have not pursued any discovery relating to damages". ECF No. 94 at 1. *See* Defendants' September 24, 2021 response to Interrogatory Request, Nos. 4 and 5 (filed herewith).

no recollection of Carpenter being physically restrained during the search.  Giaimo at 7-8, lines 25-4.  Indeed, ASAC Garcia and the Search Team were executing a search warrant, not an arrest warrant.  *United States v. Sealed Search Warrant*, Docket No. 3:18-mj-59 (JGM), ECF No. 2 at 1 (unsealed search warrant).  *See also* Operational Plan, Exhibit 1 at 23.  As such, there was no authority to arrest Carpenter or place him into custody and they did not do so.

Indeed, Carpenter and Giaimo were free to make telephone calls while they remained at the Simsbury site during the search.  Special Agent Woolard, who was in the conference room with Carpenter documented Carpenter's telephone call.  Garcia ¶ 11, Exhibit 3 to Garcia Declaration, Exhibit 3 to Allen Declaration, Giaimo at 8, lines 10-14.

While in the conference room, Carpenter made unsolicited utterances in the presence of ASAC Garcia and Special Agent Woolard, and those utterances were noted by Special Agent Woolard.  Exhibit 3 to Allen Declaration.  Once Giaimo arrived at or about 11:07 a.m., ASAC Garcia advised the lead prosecutor that Carpenter was willing to talk to her, and she inquired as to whether she should talk with Carpenter because ASAC Garcia knew that she needed prior approval from the lead prosecutor prior to any interview of Carpenter.  Garcia ¶ 13, Exhibit 5 to Garcia Declaration.  Ultimately, ASAC Garcia, who was present in the conference room with Carpenter at all times during the search, did not interview Carpenter and did not observe or permit any other agent to interview Carpenter.  Garcia ¶ 15.  The Operational Plan required the Search Team to first contact Special Agent Allen and obtain interview questions for any target, including Carpenter, before proceeding with an interview.  Operational Plan, Exhibit 1 at 9.  No one on the Search Team contacted Special Agent Allen on May 26, 2011 to request interview questions to be used in an interview of Carpenter.  Allen ¶ 9.  Additionally, Special Agent Allen was not ASAC Garcia's supervisor and was not the Site Supervisor at the Simsbury site, and

therefore Special Agent Allen would not have had authority to authorize ASAC Garcia to conduct an interview of Carpenter. Allen ¶ 9. The Charter Oak Trust case file maintained by DOL-OIG does not contain any interview notes and/or written report concerning an interview of Carpenter on May 26, 2011. Interview notes and subsequent written reports are required to be generated and maintained in the DOL-OIG case file. Allen ¶ 10.

*Allegations that Search Exceeded the Scope of the Warrant*

Carpenter has not identified any document seized by Investigator Corsi that was outside the scope of the warrant. The search warrant specifically authorized the seizure of Carpenter's federal and state income tax returns and banking documents, as well as "all books and records, . . . including billing statements". *United States v. Sealed Search Warrant,* Docket No. 3:18-mj-59 (JGM), ECF No. 1-1 at 53, 54, ¶ a, c, j, k.

## ANALYSIS

*1. Special Agent Allen Had No Personal Involvement and Was Not a Supervisor*

The undisputed facts in this case establish that Special Agent Allen was not directly or personally involved in any of the alleged Fourth Amendment violations involving the purported destruction of property; alleged interrogation of Carpenter; or seizure of documents allegedly beyond the scope of the warrant.

### A. Personal Involvement

The record establishes that on May 26, 2011, Special Agent Allen was not at the Simsbury site, where the alleged violations are claimed to have occurred, but instead was assisting in the execution of a search warrant at an entirely different location. Indeed, Carpenter concedes that he did not encounter Special Agent Allen at the Simsbury site on May 26, 2011. Carpenter filed this lawsuit against Special Agent Allen mostly because she signed the search

warrant affidavit. Accordingly, Special Agent Allen did not personally engage in any of the conduct that forms the basis of Carpenter's claims of unreasonable search and seizure.

Because there is no evidence that shows Special Agent Allen's direct or personal involvement in the conduct that allegedly gave rise to Plaintiffs' Fourth Amendment claims involving the reasonableness of the search, the purported detention and coercive or custodial interrogation, and the scope of the search, the Court should grant summary judgment as to all such claims concerning Special Agent Allen. *See, e.g., Iqbal*, 556 U.S. at 677 ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct"); *see also Wood v. Moss*, 572 U.S. 744, 763.

B. <u>Absence of Supervisory Authority</u>

Moreover, Special Agent Allen cannot be held responsible for the acts of other DOL agents and investigators under any recognized theory of *Bivens* liability. Special Agent Allen was not a supervisory official as to the search warrant execution that took place at Charter Oak Trust's offices on May 26, 2011. Special Agent Allen, as co-case agent, was responsible for drafting and submitting for review the search warrant affidavit setting forth the probable cause to search the Simsbury site; but it was ASAC Garcia who was designated the Site Supervisor at the Simsbury site during the search. Special Agent Allen was not ASAC Garcia's supervisor.

Because Special Agent Allen was not ASAC Garcia's supervisor, there is no viable legal or factual claim under the theory of *respondeat superior* that Special Agent Allen authorized her supervisor, ASAC Garcia, to allegedly detain or interrogate Carpenter.

2. *Investigator Corsi Was Not Part of the Entry Team and Searched Only a Small Area of the Simsbury Site*

Similarly, the record establishes that on May 26, 2011, Investigator Corsi was not part of the Entry Team at the Simsbury site and waited outside while the Entry Team made an initial security sweep and photographed the area where Investigator Corsi was assigned to search. The photographs demonstrate that there was no damage caused by execution of the search warrant, including at the limited area assigned to Investigator Corsi. Investigator Corsi also had no direct interaction with Carpenter during the search, and was not assigned to the conference room where Carpenter remained. Investigator Corsi did not have any opportunity to interview Carpenter, nor is there any allegation that Investigator Corsi participated in any alleged coercive interrogation. Carpenter filed this lawsuit against Investigator Corsi mostly because Investigator Corsi searched Carpenter's private office. Accordingly, Investigator Corsi did not personally engage in any of the conduct related to the condition of the property (with the exception of Carpenter's personal office) or the alleged detainment or coercive interrogation of Carpenter, which form the basis of his claims of unreasonable search and seizure.

Because there is no evidence that shows Investigator Corsi's direct or personal involvement in the conduct that allegedly gave rise to Plaintiffs' Fourth Amendment claims involving the reasonableness of the search and the purported detention and coercive or custodial interrogation, the Court should grant summary judgment as to all such claims concerning Investigator Corsi.

3. *There was no damage to the Simsbury Site on May 26, 2011.*

The record establishes that there was no damage or destruction to any property at the Simsbury site on the day of the search. In addition to the photographic evidence, the eyewitness

testimony of ASAC Garcia, Investigator Corsi, and Carpenter's own attorney all confirm that no damage resulted from the execution of the search warrant at the Simsbury site on May 26, 2011.

The Plaintiffs concede this issue by not claiming any physical damage in their damages analysis. Since there is no issue concerning the condition of the property as a result of the execution of the search warrant on May 26, 2011, the Court should grant summary judgment as to the claim of damage to property.

4. *There was no Coercive or Custodial Interrogation of Carpenter during the search.*

A. Plaintiffs' Allegations

Plaintiffs contend that Special Agent Allen authorized ASAC Garcia to interrogate Carpenter without his lawyer present and that during the search, Carpenter was placed in custody and questioned despite invoking his right to counsel and to remain silent. The Plaintiffs also allege that Carpenter and unspecified individuals were held against their will and incommunicado for several hours.

First, Plaintiffs have no standing to assert the rights of other individuals and cannot obtain civil damages for allegedly unreasonable conduct committed against other third parties.[12]

Second, Carpenter was not interrogated in any way, and Carpenter's claim to the contrary is belied by the record. Carpenter requested entry into the building after the search had begun. Once admitted into the building, Carpenter was escorted to a front conference room where he made unsolicited utterances which were documented. Carpenter also used the brief period of time (about a half hour) while waiting for his attorney to arrive to review the search warrant attachment, and engage in a telephone conversation. Special Agent Woolard documented

---

[12] *See Carpenter v. IRS,* Docket No. 3:13-cv-563 (SRU), ECF No. 92 at 21, where this Court similarly ruled that "[a]s a preliminary matter, I note that Carpenter cannot assert claims on behalf of other parties, such as GMC employees."

Carpenter's side of the telephone conversation, and her notes confirm that Giaimo had not yet arrived. Once Giaimo did arrive, ASAC Garcia refrained from interviewing Carpenter, even though Carpenter expressed his willingness to talk to the agents while having his lawyer present with him in the same room. In fact, ASAC Garcia did not even request interview questions from Special Agent Allen, as the Operational Plan required as a prerequisite. Instead, the evidence shows that ASAC Garcia sought guidance from the lead prosecutor, and thereafter opted not to interview Carpenter even in the presence of counsel. The DOL-OIG file reinforces the conclusion that no interview took place, as there are no interview notes or report from ASAC Garcia.

Moreover, even if the facts supported a claim of a violation of a constitutional right, that right would not have been clearly established based upon the totality of the circumstances, including Carpenter's initial unsolicited utterances, his willingness to talk to agents in the presence of his attorney, and his voluntary return to the Simsbury site a second time later the same day. Thus, even if Carpenter had been interviewed during the search, it would not be a bar to qualified immunity.

Carpenter was also not detained in order to obtain statements. On the contrary, Carpenter voluntarily requested entry into the Simsbury site during the search. Carpenter's attorney, who arrived a half-hour after Carpenter, did not observe or encounter any physical restraint. While Carpenter was initially waiting in the conference room for his attorney, he communicated on the telephone. Once his attorney arrived, Carpenter indicated a willingness to talk with ASAC Garcia and Special Agent Woolard, who were present in the conference room with Carpenter, but ultimately the agents declined to interview Carpenter. During his time inside the building,

Carpenter was not questioned, handcuffed, threatened, assaulted, coerced to incriminate himself, or otherwise mistreated.

Carpenter and his attorney freely left the Simsbury site while the search was ongoing. Carpenter voluntarily returned to the Simsbury site a second time and was permitted entry a second time to retrieve personal items and then, fifteen minutes later, left the building a second time. The Court should grant summary judgment as to the claims of detention and coercive interrogation.

B. Clearly Established Law Permits Restricting the Movement of Occupants

"An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Bailey v. United States*, 568 U.S. 186, 193 (2013) (quoting *Muehler v. Mena*, 544 U.S. 93, 98 (2005)); *see also Rivera v. United States*, 928 F.2d 592, 606 (2d Cir. 1991). This categorical rule ensures that "officers can search without fear that occupants, who are on the premises and able to observe the course of the search, will become disruptive, dangerous, or otherwise frustrate the search."[13] *Bailey*, 568 U.S. at 195. *See also* this Court's application of *Mountain Pure v. Roberts,* 814 F.3d 928 (8th Cir. 2016) ("The Eighth Circuit in *Mountain Pure* also rejected a claim of unreasonable force despite additional allegations of detention in a break room during the search, which lasted twelve hours . . . *Mountain Pure* is thus a case of approval of even more coercive methods than the case before me, inasmuch as, at a minimum, no one present at the Simsbury site was detained for the full duration of the search." *Carpenter v. IRS,* Docket No. 3:13-cv-563 (SRU), ECF No. 150 at 31, n. 46.

---

[13] Indeed, one of the occupants that the Entry Team initially encountered at the Simsbury site had a firearm in his possession. Garcia ¶ 8.

Here, Carpenter's presence in the conference room did not constitute a detention or seizure by DOL-OIG, because a reasonable person would have concluded that he was free to leave the premises and did in fact, leave the premises-- twice. *See United States v. Wiggan*, No. 3:09cr51 (SRU), 2010 WL 2698277, at *5 (D. Conn. July 8, 2010) (Underhill, J.). Carpenter was not initially in the office space when the search began and could not initially enter when he arrived because the doors were secured by the Entry Team. Only after Carpenter requested admittance to the office space to wait for his attorney to arrive, was he allowed to enter the premises, and was then directed to remain in a conference room. Carpenter was not placed in custody, was free to converse on the telephone while he waited, and his attorney joined him a half-hour after Carpenter arrived. The agents did not request Carpenter remain at the Simsbury site, and indeed Carpenter left on his own accord, with his attorney, only to voluntarily return a second time to retrieve personal effects from his office and then freely leave again, about fifteen minutes later.

Limiting Carpenter's building access to a conference room to ensure the safety and integrity of the search was not an arrest and did not violate clearly established law. *See* Operational Plan, Exhibit 1 at 9 ("If subjects are present, separate targets and limit their movements to a secured area during the conduct of the search.")

### 5. *The Seizure of Certain Documents Did Not Exceed the Scope of the Search Warrant*

Carpenter generally claims that income tax filings, banking, insurance policies and other unspecified personal financial information were seized and that those items exceeded the scope of the search warrant.[14] Carpenter then provides a more detailed description that Investigator Corsi seized information concerning Carpenter's life and homeowner's insurance policies.

---

[14] Carpenter, through counsel, was provided copies of all documents seized during the May 26, 2011 search during the course of the underlying criminal prosecution.

First, the seizure of Carpenter's personal income tax returns and banking records were specifically authorized by the search warrant. The only items seized by Investigator Corsi that pertain to Carpenter's life or homeowner's insurance policies are two statements showing billing information- one showing credits, discounts and premium information, and the second a statement of automatic premium payment and loan activity. The seizure of these two documents was also specifically authorized by the search warrant.

In the alternative, even if the two documents are determined as not falling within the description of "all books and records, . . . including billing statements," an examination of the two documents shows that it was nonetheless reasonable for Investigator Corsi to believe that the documents contained billing information. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, *Id.* at 743. In analyzing Investigator Corsi's good faith believe that the two documents were subject to seizure, the Court must again consider the totality of the circumstances, including the facts known to Investigator Corsi at the time. Those additional facts were, first, the reference to real estate located in Rhode Island on the folder containing one of the documents, and Investigator Corsi's knowledge that the purchase of that real estate may have been funded from the proceeds of Carpenter's insurance fraud. Corsi ¶ 14. Second, Investigator Corsi's knowledge that the reference to "Benistar" on the second document was a reference to a Carpenter-related business entity that is also referenced in the search warrant affidavit and the Operational Plan for the search of the Simsbury site. Corsi ¶ 15.

Accordingly, qualified immunity applies to Investigator Corsi's reasonable decision to seize the two insurance-related documents containing both billing information and references

pertinent to the underlying criminal investigation, because his actions did not violate a clearly established statutory or constitutional rights of which a reasonable person would know.

Lastly, Plaintiffs generally state that attorney-client privileged documents were also seized during the search. The search warrant affidavit directly addressed issues of privilege in advance of the warrant execution. More specifically, the Search Team was authorized to seize potentially privileged material, and that steps would be taken for a subsequent screening process. After the search, Plaintiffs entered into a Court-approved agreement with the Government in which they agreed to allow the Government to review potentially privileged documents seized during the search. *See United States v. Sealed Search Warrant,* 3:18-mj-59 (JGM), ECF No. 1-1 at 44-49, ¶¶ 131-138; *In Re: Grand Jury Proceedings,* Sealed Case No. 3:12-cv-882 (JCH) (D. Conn. Aug. 20, 2013), ECF Nos. 65-66 (filed copy of Order and Agreement). Since the lawful seizure of potentially privileged documents is not a constitutional violation, the Court should grant summary judgment as to the claim of an unreasonable seizure of such documents.

## CONCLUSION

The undisputed facts establish that Special Agent Allen did not have direct or personal involvement in the conduct claimed to have caused Plaintiffs' constitutional deprivation. Further, the facts establish that Investigator Corsi had a limited role and did not have direct or personal involvement in the purported damage to property, or the alleged detention and coercive or custodial interrogation of Carpenter. Moreover, the evidence viewed in the light most favorable to Carpenter and his company, Grist Mill Capital, is insufficient to establish any of the remaining alleged violations of their clearly established statutory or constitutional rights. Accordingly, based upon the record and undisputed facts, and the principles of qualified immunity, the Court should grant judgment in favor of the Defendants.

Respectfully submitted,

For Defendants Lynn Allen, Cheryl Garcia
and Timothy Corsi,


Leonard C Boyle
United States Attorney

/s/

Christine Sciarrino
Assistant United States Attorney
United States Attorney's Office
157 Church Street -25th Floor
New Haven, Connecticut   06510
Tel. (203) 821-3780/Fax (203) 773-5315
Email: Christine.Sciarrino@usdoj.gov
Federal No. CT3393

<u>Certification</u>

I hereby certify that on February 15, 2022, a copy of the foregoing Memorandum was filed electronically and served by mail to anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/

Christine Sciarrino
Assistant United States Attorney