UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| DANIEL E. CARPENTER and GRIST MILL CAPITAL, LLC, | : |
| Plaintiffs, | : Docket No. 3:14CV741 (SRU) |
| VS. | : |
| LYNN ALLEN, CHERI GARCIA, TIMOTHY CORSI, JOHN DOES 1-100, and JANE DOES 1-100, | : |
| Defendants. | : |

## DECLARATION OF CHERYL A. GARCIA

I, Cheryl A. Garcia, make this declaration under penalty of perjury as permitted under Section 1746 of Title 28 of the United States Code.

1. I was an Assistant Special Agent in Charge (ASAC) of the U.S. Department of Labor, Office of Inspector General (DOL-OIG), 2005 from 2014. Prior to becoming an ASAC, I was a DOL-OIG Special Agent from 1995 to 2005. I retired in good standing from DOL-OIG in August 2019. While an ASAC, my duties included supervising case agents assigned to criminal investigations, including the Charter Oak Trust investigation. As the ASAC of the Charter Oak Trust investigation, I was the immediate supervisor of Special Agent Lynn Allen, who was the case agent assigned to the investigation. As an ASAC, I received extensive training, which included supervision of a criminal investigation, and supervised at least 70 criminal investigations prior to May 2011.

2. As the ASAC assigned to the Charter Oak Trust investigation, I read the affidavit in support of the search warrant for the premises located at 100 Grist Mill Road in Simsbury, Connecticut ("the Simsbury site"). I assisted with the drafting of the Operational Plan, and was also responsible as the final reviewer of the Operational Plan for execution of the search warrant at the Simsbury site on May 26, 2011. Exhibit 1. I was also responsible for supervising all phases of the execution of the search warrant on May 26, 2011 at the Simsbury site.

3. During the briefing held at the staging location on May 26, 2011 the approved Operational Plan was read and reviewed page by page with the personnel assisting with the execution of the search warrant. Copies of the Operational Plan were on hand for participants' review. We also reviewed Attachment D and to the best of my recollection we provided copies to the participants for their reference during the execution of the search warrant.

4. At a staging area at approximately 9:00 a.m. on the morning of May 26, 2011, prior to executing the search warrant at the Simshury site, the site leader and I as site supervisor led the briefing of all DOL-OIG special agents and EBSA investigators participating in the search, as is indicated in the Operational Plan. Exhibit 1 at 1. The briefing included all agents and investigators reviewing the Operational Plan and Attachment D to the search warrant. All agents and investigators were required to confirm their review of these documents by signing a separate confirmation sheet, which was then maintained in the case agent's case file. I recall witnessing all special agents and investigators sign the confirmation sheet.

5. Special Agent Allen was not assigned to the Team executing the search warrant at Simsbury site on May 26, 2011, and she did not participate in the physical search of the Simsbury site.

6. I was designated in the Operational Plan as part of the Entry Team for the execution of the search warrant at the Simsbury site, and was one of the first agents to enter the premises on May 26, 2011 at approximately 9:30 a.m. Exhibit 1 at 8.

7. Carpenter was not present at the Simsbury site when the Entry Team entered on May 26, 2011. Upon entry at the Simsbury site, the Entry Team identified itself as law enforcement personnel in accordance with the Operational Plan. Exhibit 1 at 7. We did a visual security sweep of the premises and as we encountered occupants we instructed the occupants to step away from their desks and then escorted them to a room near the kitchen. I confirmed via email that the entire Simsbury site was secured without incident by 10:24 a.m. Exhibit 2. During a security sweep no individuals would have been allowed to enter or leave the building. Once the security sweep was completed, a designated special agent photographed the premises in accordance with the Operational Plan. Exhibit 1 at 8.

8. Once all of the occupants were in the room near the kitchen, they were advised, as was DOL-OIG's customary practice, that they would need to provide identification and then they would be free to leave, or if they chose to stay, they would need to remain in that room with an agent. If they chose to leave, they would not be able to return. I recall addressing the occupants of the room to inquire if anyone was in possession of any weapons, such as a firearm or knife. One gentleman raised his hand and exited the room with me and another agent. He had a firearm and he had a permit on his person. An agent contacted the local police who came to the site and confirmed through their database that the permit was valid, and the individual chose to depart the site. An agent made a list of the employees and their positions in the company and photocopied their identification. The site was much larger than we expected and there were more occupants, desks, file cabinets, computers and servers than we expected. One or two employees agreed to

assist the Team by providing information about who worked at each desk and what their role was. This enabled us to determine that some work areas were less likely to contain documents relevant to Attachment D. To the best of my recollection, one or two employees remained on site for more than an hour and agents escorted them to various locations to describe the records stored in file cabinets and boxes. This also enabled us to determine that several locations were less likely to contain documents relevant to Attachment D. It was DOL-OIG's standard practice to secure the doors and monitor them for anyone who might arrive. To the best of my recollection, when Daniel Carpenter arrived, I was notified that he was at the front door. To the best of my recollection, Carpenter said he was expecting his attorney to arrive at the Simsbury site. If Carpenter wanted to come into the site to wait for his attorney, pursuant to our standard procedures[1] he would be required to stay in a designated area. Carpenter was directed into a conference room located toward the front of the building, away from the room occupied by the employees toward the back of the building. To the best of my knowledge and belief, I was present with Carpenter and Special Agent Woolard while he remained at the Simsbury site, with the exception that I may have briefly stepped out to take or make telephone calls, however another special agent would have been present because Carpenter would not have been left alone.

9. At no time was Carpenter placed in custody. We did not have an arrest warrant for Mr. Carpenter and he was not arrested and was not prohibited from leaving.

10. Prior to Attorney Giaimo arriving at the Simsbury site, I observed Carpenter reviewing a copy of the search warrant attachment. Exhibit 3.

---

[1] *See* Operational Plan, Exhibit 1 at 9 ("If subjects are present, separate targets and limit their movements to secured area during the conduct of the search.")

11. I also recall Carpenter talking on a phone in my presence while he was in the conference room. It is untrue that Carpenter was "incommunicado" during the search because I personally observed him communicating on a phone while he was in the conference room with me.

12. I did not interview Carpenter while he was at the Simsbury site on May 26, 2011; however, I do recall Carpenter making unsolicited utterances in my presence. I made contemporaneous notes of his utterances and later prepared a memorandum to the case file, which is attached as Exhibit 3.

13. At 11:02 a.m. on May 26, 2011, I was forwarded an email communication to the lead prosecutor assigned to this matter, confirming that Carpenter was represented by counsel. Exhibit 4. Upon receipt of that email, I would not have questioned Carpenter without prior approval from the lead prosecutor because Carpenter was one of the targets of the Charter Oak Trust investigation, and was represented by counsel. To the best of my recollection, agents were not allowed to question a represented party without the prosecutor's prior approval.

14. The Operational Plan allowed for interviewing "willing individuals at the site," and also provided that if targets of the investigation elected to stay during the execution of the search warrant, "assigned agents will conduct interviews if directed to do so with questions provided by Case Agent Lynn Allen." Exhibit 1 at 9. At 11:07 a.m. on May 26, 2011, I emailed the lead prosecutor in this case for additional guidance, advising that Attorney Giaimo had arrived at the Simsbury site and that Carpenter was "willing to talk". I sought additional guidance ("Can we let him talk?") because the email I had received five minutes earlier did not reference Attorney Giaimo as counsel for Carpenter and I would have needed the prosecutor's prior approval. Exhibit 5.

15. I did not personally interview Carpenter, nor allow any other agent to interview him on May 26, 2011. If I had interviewed Carpenter, I would have been required to obtain interview questions from Special Agent Allen first, in accordance with the Operational Plan. Exhibit 1.

16. I did not request interview questions from Special Agent Allen on May 26, 2011. Additionally, if I would have interviewed Carpenter I would have taken contemporaneous notes because it was my general practice to do so in order to accurately complete the required Report of Interview. I did not prepare interview notes on May 26, 2011. It is untrue that Daniel Carpenter was either "interrogated" (or interviewed) during the execution of the search warrant at the Simsbury site on May 26, 2011.

17. I remained at the Simsbury site throughout the entire execution of the search warrant. At 11:21 p.m. I contacted counsel for the Plaintiffs, Daniel LaBelle, and advised that the search would be concluded at approximately 1:30 a.m. on May 27, 2011 and requested that "someone [] come to the office to secure the building, accept copies of the inventory sheets and accept service of a few subpoenas." Exhibit 6. At the conclusion of the search, the designated special agent again photographed the premises.

18. At no time during the execution of the search warrant did I notice or observe any property damage. I did not personally damage any property. It is untrue that "substantial damage" was caused during our search of the premises, as is evidenced by the photographs taken at the beginning and end of the search. Exhibits 7A and 7B.

I declare under penalty of perjury that the foregoing is true and accurate.

Executed on this 10th day of February, 2022 at New York, New York.

CHERYL A. GARCIA