UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| DANIEL E. CARPENTER and GRIST MILL CAPITAL, LLC, : : Plaintiffs, : VS. : LYNN ALLEN, CHERI GARCIA, TIMOTHY CORSI, JOHN DOES 1-100, : and JANE DOES 1-100, : Defendants. | Docket No.  3:14CV741 (SRU) |

## DECLARATION OF TIMOTHY CORSI

I, Timothy Corsi, make this declaration under penalty of perjury as permitted under Section 1746 of Title 28 of the United States Code.

1.  I was an Investigator at the U.S. Department of Labor, Employee Benefits Security Administration (EBSA), from 2008 to 2014.  I retired in good standing from EBSA in May 2014. While an Investigator, my duties included assisting with the execution of search warrants, including the execution of a search warrant on May 26, 2011 at 100 Grist Mill Road in Simsbury, Connecticut ("Simsbury site") as part of the U.S Department of Labor-Office of Inspector General's (DOL-OIG) Charter Oak Trust investigation.  As an Investigator, I received extensive training prior to May 2011, including the document analysis required to determine what items should be seized when executing a search warrant.

2. At no time on May 26, 2011 did I observe Special Agent Lynn Allen at the Simsbury site.

3. At approximately 9:00 a.m. on the morning of May 26, 2011, prior to the execution of the search warrant at the Simsbury site, I met with other search team members at a designated pre-briefing area, and I was briefed by the Team Leader on the particulars of the search, based on the Operational Plan and the search warrant. At the pre-search briefing, I was provided copies of the Operational Plan and the search warrant, including Attachment D to the search warrant. Exhibits 1 and 2.

4. In the days leading up to May 26, 2011, EBSA Investigators assigned to the search met as a group and studied the warrant and background information related to the Charter Oak Trust investigation. At the pre-search briefing on May 26, 2011, we again reviewed the details concerning the investigation and the search and reviewed the Operational Plan and search warrant.

5. At approximately 10:00 a.m. on May 26, 2011, the Entry Team made initial entry at the Simsbury site. Since my assignment was to review documents only, I waited until the building was secure and the employees were gone before entering the Simsbury site to execute the search warrant. *See* Exhibit 1, Operational Plan at 13, designating that I would participate in the search "after entry."

6. Once I entered the premises, I observed a standard office setup, with certain areas being extremely messy with papers stacked on any available desktop, shelf, conference room table, etc.

7. Attached to this Declaration as Exhibit 3 are photographs of the section of the office area at the Simsbury site where I spent most of the day on May 26, 2011, which was in and around Daniel Carpenter's ("Carpenter") office.

8.  The only interaction I had with Carpenter was in the afternoon of May 26, 2011, after the Search Team had been executing the search warrant for several hours. Carpenter had returned to the Simsbury site in the afternoon to collect some personal items. Carpenter was permitted to re-enter the Simsbury site and was escorted into his office by OIG special agents who were part of the Search Team. I briefly stepped out of Carpenter's office to allow him to retrieve his personal items, and did not have any direct interaction with Carpenter. To the best of my recollection, Carpenter requested to retrieve the personal items for use at a family event occurring later that day. After about ten or fifteen minutes, Carpenter had retrieved his personal items and was escorted out of the Simsbury site, and I resumed executing the search warrant and reviewing documents.

9.  I have reviewed the Complaint filed in this matter and the description of the documents that are alleged to have exceeded the scope of the search warrant. The Complaint describes the documents that allegedly exceeded the scope of the search warrant as Carpenter's "income tax filings, banking, insurance policies and other personal financial information", and "confidential information regarding Mr. Carpenter's life insurance policies, personal tax returns and Mr. Carpenter's homeowners insurance policy. Complaint, ECF No. 1 at 16, 24.

10.  During the pre-search briefing, I was instructed on the procedures to use for documenting any items that I seized and I carefully recorded all documents I seized on May 26, 2011 in accordance with the instructions I received. The instructions I received included maintaining an inventory of all items that I determined were subject to seizure in accordance with the search warrant, and in particular, Attachment D to the search warrant. Exhibit 2 at 54[1]. For every document that I determined was subject to seizure and fell within the description provided in

---

[1] Exhibit 2 is the Attachment D portion of the search warrant, consisting of three pages and docketed in *United States v. Sealed Search Warrant,* Docket No. 3:18-mj-00059 (JGM), ECF No. 1-1, at 53-55. The page references in this Declaration correspond with ECF No. 1-1.

Attachment D, I made a corresponding entry on an inventory sheet, and included a brief description of the seized document. The inventory sheets I prepared during the search of the Simsbury site on May 26, 2011 are attached as Exhibit 4. *See also United States v. Sealed Search Warrant,* Docket No. 3:18mj59 (JGM), ECF No. 3 at 2, all inventory sheets included in the search warrant return, submitted under penalty of perjury.

11. Concerning the claim in the Complaint that I was responsible for the seizure of "income tax filings" and Carpenter's "personal tax returns" that allegedly exceeded the scope of the search warrant, a review of the inventory sheets that I completed indicate that the only document fitting the description of income tax filings is a document I described as "Income Tax Return – Daniel Carpenter 2008". Exhibit 4 at 3. I had a reasonable and good faith belief that the search warrant authorized the seizure of Mr. Carpenter's income tax return because Attachment D to the search warrant authorized the seizure of "Federal income tax returns" and "copies of federal and state income tax returns" pertaining to Carpenter. Search Warrant, Attachment D, Exhibit 2 at 54, ¶ a. and c.

12. Concerning the claim in the Complaint that I was responsible for the seizure of Carpenter's "banking" documents that are alleged to have exceeded the scope of the search warrant, a review of the inventory sheets that I completed indicate that the documents fitting the general description of Carpenter's "banking documents" are: "Box of Bank Records 2006-2009"; TD Bank Personal Financial Statements"; "Dan Carpenter Bank of America Statement 6-19-09 through 7/20/09"; "Bank of America acct info May 2009"; "TD Bank Statements for Daniel Carpenter"; "Bank Balances"; "TD Bank Accounts"; and "TD Account Closings". Exhibit 4 at 2-5, 8. I had a reasonable and good faith belief that the search warrant authorized the seizure of Carpenter's

"banking documents" because Attachment D to the search warrant authorized the seizure of "bank records" pertaining to Carpenter.  Search Warrant, Attachment D, Exhibit 2 at 54, 55 ¶ j. and k.

13.  Concerning the claim in the Complaint that I was responsible for the seizure of Carpenter's "insurance policies", "life insurance policies" and "homeowners insurance policy" that allegedly exceeded the scope of the search warrant, a review of the inventory sheets that I completed indicate that the only documents fitting the description of Carpenter's life, homeowners or general insurance policies are "Dan Carpenter Homeowner's policy" and "Dan Carpenter life insurance loan payments – 2 envelopes".  Exhibit 4 at 4.

14.  The document that I described as "Dan Carpenter Homeowner's policy" is a 4-page document issued by USAA.  Exhibit 5.  The first page is entitled "Homeowners Policy Packet" and was addressed to Carpenter.  The second page indicated at the top that it was an "Amended Declarations Page", and included on that same page was a line titled "Credits and Discounts" with an amount of "$587.68 CR" and a "Total Policy Premium" of $3,877.07".  The bottom of the second page indicated a "Total Policy Premium" of $3,877.07, with a "Total Prorated Return" of $31.79.  I had a reasonable and good faith belief that the search warrant authorized the seizure of this USAA document because Attachment D to the search warrant authorized the seizure of "[a]ll books and records, including . . . billing statements" pertaining to Carpenter.  Search Warrant, Attachment D, Exhibit 2 at 54, ¶ a.

Additionally, the fourth page of Exhibit 5 is actually a copy of a manila folder that contained the USAA document.  The folder bears the hand-written notation "USAA – Moonstone".  Based on the pre-search briefing, I believed that the "Moonstone" reference was a reference to either Moonstone Partners, LLC, through which Carpenter purchased real estate with proceeds from his fraudulent scheme, and/or the actual real estate purchased by Moonstone Partners, LLC,

which is located in the Moonstone Beach section of Kingstown, Rhode Island. *See United States v. Daniel Carpenter*, Docket No. 3:13CR226 (RNC), Verdicts and Special Findings, ECF No. 212 at 77 ("The proceeds of the Spencer policies also funded the defendant's purchase of real estate in Rhode Island. The defendant made an offer on the property on behalf of an entity known as Moonstone Partners, LLC . . .").

15. The document that I described as "Dan Carpenter life insurance loan payments – 2 envelopes" consisted of two MetLife insurance statements, each of which were one-page in length. Exhibit 6. Both statements are addressed to "Daniel E. Carpenter Benistar Client SVC, and reference the Simsbury site location as a business address. The first page is a "Statement of Automatic Premium Payment" and the second page is a "Statement of Loan Activity". I had a reasonable and good faith belief that the search warrant authorized the seizure of these MetLife insurance statements because Attachment D to the search warrant authorized the seizure of "[a]ll books and records, including . . . billing statements" pertaining to Carpenter. Search Warrant, Attachment D, Exhibit 2 at 54, ¶ a.

Additionally, based on the pre-search briefing and the references to "Benistar" in the Search Warrant Affidavit and the Operational Plan (Exhibit 1 at 1) that I reviewed, I was familiar with the reference to "Benistar" as a Carpenter-related business entity. *See also United States v. Daniel Carpenter,* Docket No. 3:13CR226 (RNC), Verdicts and Special Findings, ECF No. 212 at 23 ("During the time period relevant to this case, Mr. Carpenter controlled a number of business entities located in offices at 100 Grist Mill Road in Simsbury, Connecticut . . . 'the "Benistar Entities"'").

16. I remained at the Simsbury site throughout the entire search. I recall that it was an extremely long day and did not leave until well into the evening. At no time during the execution

of the search warrant did I notice or observe any property damage.  I did not personally damage any property.  It is untrue that "substantial damage" was caused during my search of the premises.

I declare under penalty of perjury that the foregoing is true and accurate.

Executed on this _2/11/2022_ day of _____, 2022 at _____, Connecticut.

                                                                            _Timothy Corsi_
                                                                            DocuSigned by: 6F13BA8EA743484...
                                                                            TIMOTHY CORSI